[No. C015296. Third Dist. Mar. 2, 1994.]

NANCY DUARTE et al., Plaintiffs and Appellants, v.
CHAMINOOR U. ZACHARIAH et al., Defendants and Respondents.

## COUNSEL

Drivon & Tabak, Stewart M. Tabak and Will Glennon for Plaintiffs and Appellants.

Horvitz & Levy, H. Thomas Watson, Lisa Perrochet, Sandra J. Smith, Donahue & Callaham, Robert B. Zaro and Stephen J. Mackey for Defendants and Respondents.

## OPINION

**BLEASE, Acting P. J.**—Nancy Duarte (Duarte) and her spouse appeal from a grant of nonsuit in favor of the defendant physician, Chaminoor Zachariah, in a medical malpractice action.

The Duartes' evidence affords the inference that Zachariah's negligent overprescription of a drug harmed her bone marrow, preventing completion of treatment with chemotherapy which would have lowered the likelihood of the recurrence of Duarte's breast cancer. The cancer did recur. The nonsuit was granted on the ground the negligence was not a cause in fact of personal injury to the Duartes because the cancer would as likely as not have recurred regardless of chemotherapy. We agree with that reasoning insofar as it bars recovery for recurrence of the cancer.

However, the Duartes advance an alternative contention with which we also agree: that the harmful injury to her bone marrow which impaired its functioning is actionable regardless whether it was a cause in fact of the recurrence of the cancer.

We will reverse the judgment.

### FACTS AND PROCEDURAL BACKGROUND

Under the standard of review for a grant of nonsuit the pertinent facts are as follows.[1] Zachariah is a specialist in the fields of cancer and blood diseases. In June 1991 Duarte was referred to Zachariah to discuss chemotherapy, after a mastectomy to remove a breast cancer. He recommended

---

[1]*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948], restates the pertinent standard as follows:

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]

"In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation.] We will not sustain the

chemotherapy to destroy tumor cells that might be left in her body and thereby increase her chances of avoiding a recurrence of cancer. In September 1991 she agreed.

One of the drugs administered in the chemotherapy regime was cytoxin. Cytoxin kills cells, particularly those that are rapidly dividing. It causes severe damage to the nuclear apparatus of cells, both cancerous cells and normal cells. Ina Bounds, Zachariah's nurse, calculated the cytoxin dosage based upon Duarte's height and weight. The calculation was erroneous and called for five times the appropriate amount of cytoxin. Zachariah checked the calculation, but failed to catch the error.

Duarte followed the directions given her and took the prescribed amount of cytoxin for several days. She became nauseous, confused, agitated, depressed and suffered headaches. When she returned to Zachariah's office for her next appointment she told him she had been extremely ill and did not want to continue chemotherapy. He discovered the incorrect dosage of cytoxin and halted the chemotherapy.

Soon thereafter Duarte transferred to Marilyn Swanson, another physician specializing in cancer and blood disorders. Swanson intended to reinstitute the chemotherapy course of treatment, but discovered that Duarte's platelet count was extremely low. Platelets are the component of blood that cause blood to clot in response to a wound or cut. Swanson deferred reinstituting the chemotherapy because of the abnormal blood value. Swanson was concerned that chemotherapy would adversely affect the bone marrow resulting in life-threatening low platelet counts that could predispose Duarte to spontaneous bleeding and hemorrhaging. After various tests Swanson concluded that the overdose of cytoxin had damaged Duarte's bone marrow, rendering it less capable of replacing blood platelets. Because of this condition Swanson was unable to reinstitute chemotherapy.

In April 1992, Swanson detected an abnormality on a Duarte chest X-ray. In September 1992, a nodule was removed and determined to be cancerous. In Swanson's opinion this was a recurrence of the breast cancer which had spread to the lung.

Various opinions on the efficacy of chemotherapy in inhibiting a recurrence of cancer were adduced at trial. Zachariah testified that without

judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' [Citations.]" (Original italics.)

chemotherapy there was a 90 percent chance that Duarte would not suffer a recurrence within five years and that chemotherapy adds maybe a 3 to 4 percent advantage. Swanson testified that Duarte's chances for avoiding recurrence during this interval would be enhanced from 90 to 95 percent by chemotherapy. Swanson conceded that there was no way to determine whether Duarte was in the 5 percent of patients who would have suffered a recurrence within five years regardless of chemotherapy.

Swanson also testified that without chemotherapy there was an 80 percent chance that the cancer would not recur within a 10-year period and that after chemotherapy the survival rate was "[s]omewhere between 88, 90, 91 percent." Shortly after making this statement she agreed to the statement that "the 95 percent [chance] of five-year disease-free survival with proper chemotherapy would drop to somewhere between 88 to 90 percent for the ten-year period[.]"

After both sides had rested but before the matter was submitted to the jury the question of nonsuit on the ground of insufficient evidence of causation was extensively debated. Zachariah relied upon *Dumas* v. *Cooney* (1991) 235 Cal.App.3d 1593, 1603-1611 [1 Cal.Rptr.2d 584]. His counsel argued that since, at best, there was only a 50 percent probability that chemotherapy would avert the recurrence of cancer in the five-year period, the Duartes had failed to show that the admittedly negligent prescription of cytoxin was a cause of the recurrence of the cancer. The trial court was persuaded by this argument and indicated it would grant the motion for nonsuit. The Duartes suggested that they should nonetheless be permitted to seek a recovery for the "bone marrow damage." The trial court said: "That's not the theory that we came in on" and reiterated its determination that nonsuit was appropriate.

## DISCUSSION

### I

The Duartes contend the evidence affords an inference that the recurrence of the cancer was caused by the lack of chemotherapy and that in any event the bone marrow injury was actionable. Only the second contention has merit.

■ Zachariah relies upon *Dumas* v. *Cooney, supra*, 235 Cal.App.3d 1593.[2] *Dumas* holds that negligent conduct was not a cause in fact of an injury "where the evidence indicates that there is less than a probability, i.e.,

[2]The Duartes suggest that *Dumas* is inapposite on two grounds. First, they argue that in *Dumas* the issue of negligence was seriously in doubt. This has no bearing on the *Dumas*

a 50-50 possibility or a mere chance," that the injury would have ensued. (*Id.* at pp. 1603-1608; also see, e.g., *Bromme* v. *Pavitt* (1992) 5 Cal.App.4th 1487, 1498 [7 Cal.Rptr.2d 608].)[3] Given this standard of causation, the Duartes failed to adduce substantial evidence that Zachariah's negligence was a cause in fact of the recurrence of the cancer.

## A.

The Duartes claim that the statistical benefit to Duarte "from chemotherapy would be not a 50% increase in the odds, but over a 90% increase." They reason as follows. The probabilities of recurrence of cancer apply to the pool of patients who had the existing tumor successfully removed and had no cancer cells present in the lymph nodes. Cancer may spread through the lymph system or the blood system if the original tumor is not completely removed. From the fact of recurrence in Duarte it is reasonable to infer that her cancer spread through the blood system. Thus, she is in the small group of cancer patients for whom the benefit of chemotherapy is targeted. If the benefit of chemotherapy is viewed with respect to this small group the statistical benefits would be over a 90 percent increase.

The last step in this chain of inference is insupportable. Swanson's testimony concerning the estimated probabilities of improved outcome after chemotherapy were predicated on Duarte's characteristics. The small pool of which she was a member was the 10 percent of patients with successful removal of the original tumor and no indication of lymph node spread in whom cancer would recur in the absence of chemotherapy. The benefit of chemotherapy to that pool is that 50 percent do not suffer a recurrence of cancer. Accordingly, Duarte's claim of a 90 percent benefit is not meritorious.

---

holding concerning cause in fact. The issues of negligent conduct and cause in fact are logically unconnected. (See, e.g., Rest.2d Torts, § 430.) Second, they argue that *Dumas* cannot mean what it says about causation because, despite the ostensible insufficiency of the evidence of causation the court remanded the matter for new trial. That disposition does not undercut the holding. *Dumas* reviewed a defendant's claim of instructional error. In that circumstance, where *reversal* of a civil judgment is grounded upon insufficient evidence, the ordinary disposition is to set the matter at large for new trial unless it is clear in the opinion of the reviewing court that no new material evidence could be adduced. (See, e.g., *Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879-880 [242 Cal.Rptr. 184].)

[3]The substantial factor test subsumes a cause in fact test. (See Rest.2d Torts, § 431, com. a, p. 429 [the requirement "that the harm would not have occurred had the actor not been negligent" is part of the substantial factor test]; *Doupnik* v. *General Motors Corp.* (1990) 225 Cal.App.3d 849, 861 [275 Cal.Rptr. 715]; cf., e.g., *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 994-995 [25 Cal.Rptr.2d 550, 863 P.2d 795].)

## B.

The Duartes argue that the jury could have inferred that the probability of avoiding recurrence of the cancer attributable to chemotherapy exceeds 50 percent based on testimony that the odds of recurrence within 10 years were 20 percent without chemotherapy and 9 percent with chemotherapy. The problem with this belated claim is that there was no such testimony. Swanson's ephemeral testimony was that the odds of no recurrence with chemotherapy were "somewhere between" 88 and 91 percent. She did not apply this range to Duarte and, unlike her testimony regarding the five-year prognosis for recurrence, she did not testify to an estimate of the specific probability in Duarte's case. On the record before us there is no basis for an inference that the applicable probability is 90.9 percent rather than 88.1 percent; hence the derivative inference of a causal connection between chemotherapy and destruction or disruption of the cancers in a majority of the cases cannot be drawn.

## C.

The Duartes argue that evidence other than the testimony of the statistical likelihood of recurrence of the cancer affords an inference of cause in fact. The evidence to which they point is Swanson's testimony that chemotherapy "significantly reduces the incidence of recurrence" and "improves very conclusively the degrees for survival," as well as testimony by a defense physician witness that "[s]tatistically, she had a probability of obtaining a benefit" from chemotherapy. However, the description of the effect of a factor, chemotherapy, which halves the likelihood of recurrence of cancer is consistent with all of these formulations. This testimony must be read in light of and consistent with the evidence concerning the statistical likelihood of recurrence of the cancer. It does not advance the Duartes' case for attribution of cause in fact into the range of more likely than not.

In a final attempt to evade the unfavorable consequences of the statistical testimony the Duartes note the recent comment of the California Supreme Court in *Arato* v. *Avedon* (1993) 5 Cal.4th 1172, 1186 [23 Cal.Rptr.2d 131, 858 P.2d 598] that: "Without exception, the testimony of every physician-witness at trial confirmed what is evident even to a nonprofessional: statistical morbidity values derived from the experience of population groups are inherently unreliable and offer little assurance regarding the fate of the individual patient; indeed, to assume that such data are conclusive in themselves smacks of a refusal to explore treatment alternatives and the medical abdication of the patient's well-being."

This observation, concerning different statistics, made in a different context, does not advance the Duartes' claim. If the statistics are "inherently

unreliable" regarding the fate of individuals, that cuts against the Duartes, who have the burden of proof of causation. In *Arato* there was "evidence of articulable grounds for the conclusion that the particular features of Mr. Arato's case distinguished it from the typical population of pancreatic cancer sufferers and their dismal statistical probabilities . . . ." (5 Cal.4th at p. 1186.) Here there is nothing in the evidence which affords an inference that factors particular to Duarte rendered her more likely to suffer a recurrence of the breast cancer as a result of the negligent overdose than the general population.

II

The Duartes' alternate contention is the trial court erred because the jury could have found Zachariah's negligence caused harm to Duarte's bone marrow and that injury is actionable regardless whether it can be shown to have been a cause in fact of the recurrence of the cancer. We agree.

Dr. Swanson testified that as a result of the impairment it is impossible to treat the cancer by chemotherapy in a last ditch effort to trigger a remission. The Duartes suggest that this has lowered Duarte's life expectancy and inferably caused her to suffer from the knowledge that her plight is hopeless because of Zachariah's negligence.

Zachariah responds that this claim suffers from the same failure to prove causation regarding the claim of harm attributable to the recurrence of the cancer. We disagree. The argument rests on the invalid premise that no injury short of cancer is cognizable when the functioning of the bone marrow is detrimentally impaired. The injury to Duarte's bone marrow inferably caused by Zachariah's negligence is itself an actionable harm to the body for which damages are recoverable.

During the pendency of this appeal the California Supreme Court raised but had no occasion to resolve a related question in *Potter* v. *Firestone Tire & Rubber Co.*, *supra*, 6 Cal.4th at pages 981-984.[4] The plaintiffs were exposed to toxic wastes at a landfill which infiltrated their well water. They claimed an enhanced but unquantifiable risk of developing cancer from damage to their immune systems caused by the exposure. As pertinent here, the court limited its consideration of damages to the claim that the plaintiffs suffered actionable emotional distress from fear the toxins would cause cancer. (*Id.* at p. 980.) Since the trial court failed to find that "plaintiff's exposure to the contaminated well water resulted in physical injury" the

---

[4]We solicited additional briefing from the parties concerning the pertinent discussion contained in that opinion.

court said that "we lack an appropriate factual record for resolving whether impairment to the immune response system or cellular damage constitutes a physical injury for which parasitic damages for emotional distress ought to be available." (*Id.* at p. 984, fn. omitted.)

The majority opinion in *Potter* v. *Firestone & Rubber Co.*, *supra*, suggests that there is a split of authority among courts in other jurisdictions whether exposure to toxins causing "impairment of the immune system response and cellular damage constitute 'physical injury' sufficient to allow recovery for parasitic emotional distress damages [in the nature of apprehension of a future cancer]." (6 Cal.4th at p. 982.) The opinion notes that ". . . in ordinary negligence actions for physical injury, recovery for emotional distress caused by that injury is available as an item of parasitic damages" but that no California case addresses the question it poses. (*Id.* at pp. 981-982.) While the question here is not precisely the same as that raised in *Potter*, the authorities it cites are helpful in resolving this appeal.

At issue is whether the Duartes have a cause of action for negligence in the practice of medicine for a harmful injury to Nancy Duarte's bone marrow of the kind claimed here.

Civil Code section 1708 provides that "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights." It has been said that this principle is the foundation of our negligence law. (See *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) "Injury" is sometimes distinguished in the law of tort from "harm." The Restatement Second of Torts applies the term "injury" to any invasion of a legally protected interest, such as the interest in bodily security. (§ 7.) Such an invasion may occasion "harm": "Physical changes or alterations may be either beneficial, detrimental, or of no consequence to a person. In so far as physical changes have a detrimental effect on a person, that person suffers harm." (§ 7, com. b.)

The preliminary question is whether "injuring the person" within the meaning of Civil Code section 1708 applies in a negligence action only to "injury" in the sense of an invasion of a legally protected interest in bodily security (see Rest.2d Torts, § 1, com. d). ▮ We conclude that it does not; a cause of action in negligence requires "harm" in the sense of detrimental physical changes to the body and we read that to be the meaning of "injuring the person" in section 1708.

Some causes of action permit recovery of nominal damages, even though no "harm" has been caused by tortious conduct. However, "actual damage"

in the sense of "harm" is necessary to a cause of action in negligence; nominal damages are not awarded. (See, e.g., *Alhino* v. *Starr* (1980) 112 Cal.App.3d 158, 176 [169 Cal.Rptr. 136]; Rest.2d Torts, § 907, com. a, p. 462; Prosser & Keeton on Torts (5th ed. 1984) § 30, p. 165; *Schweitzer* v. *Consolidated Rail Corp. (Conrail)* (3d Cir. 1985) 758 F.2d 936, 942.) This is reflected in the California statutes. Compensatory damages are allowed to one "who suffers detriment." (Civ. Code, § 3281; see also *id.,* § 3333.) "Detriment is a loss or harm suffered in person or property." (Civ. Code, § 3282.)

The existence of "harm," not the harmless invasion of a legally protected interest, is the predicate for the line of asbestos exposure cases cited in *Potter* as suggesting that damage to the immune system might not constitute physical injury sufficient for the award of fear of future cancer damages. They address the question whether exposure to asbestos predicated upon "harmless" changes in the body attributable to exposure to asbestos is actionable. In *Schweitzer,* this is described as a "subclinical asbestos-related injury." In the other cases the bodily changes are described as "Pleural plaques, pleural thickening and the ingestion of asbestos fibers [constituting] a 'technical invasion of the integrity of the plaintiff's person by . . . *harmless,* but offensive, contact' . . . ." (*In re Hawaii Federal Asbestos Cases* (D.Hawaii 1990) 734 F.Supp. 1563, 1567, fn. 7 [italics added]; accord, *Owens-Illinois* v. *Armstrong* (1991) 87 Md.App. 699 [591 A.2d 544, 560-561].)[5]

 The rationale of these cases—that there is no personal injury if there is no physical harm—does not preclude a finding that damage to the immune system constitutes physical harm sufficient to support a cause of

---

[5]The contrasting line of cases cited in *Potter* as supporting such "parasitic" fear of cancer recovery could be distinguished on the ground that in those cases "harm" was shown or alleged (however inadequately). (See the synopses in *Potter* v. *Firestone Tire & Rubber Co., supra,* 6 Cal.4th at pp. 982-983.) *Anderson* v. *W.R. Grace & Co.* (D.Mass 1986) 628 F.Supp. 1219, 1226-1227, applying Massachusetts law expressly relies on the distinction between "injury" and "harm" as its rationale in permitting claims for recovery for "subcellular" harm to immunological and blood systems, among others. The defendants in *Anderson* argued that such damage was not cognizable because it did not meet the Massachusetts law requirement that physical harm be manifested by objective symptomatology and substantiated by expert medical testimony. The *Anderson* opinion replies as follows.

"In setting forth this requirement, the court did not distinguish between gross and subcellular harm. Instead, the court drew a line between harm which can be proven to exist through expert medical testimony based on objective evidence and harm which is merely speculative or based solely on a plaintiff's unsupported assertions. The phrase 'manifested by objective symptomatology' does not indicate that the necessary harm need be immediately apparent but that its existence must be objectively evidenced. Where, as in this case, the harm is not obvious to the layman, its existence may not be demonstrated solely by the complaints of the alleged victim; it must also be 'substantiated by expert medical testimony.' " (628 F.Supp. at pp. 1226-1227.)

action.[6] That turns on whether the evidence shows the functioning of the immune system has been demonstrably impaired. In our view the evidence in this case presents a triable issue of fact of personal injury in the nature of "harm" to Duarte's bone marrow.[7]

Zachariah concedes that the evidence would permit the jury to infer that his negligent prescription of the cytoxin overdose impaired the bone marrow's ability to produce blood platelets. Such an impairment is a detrimental change in the physical condition of Duarte's body. The evidence shows that platelets are the component of blood that causes the blood to clot in response to a wound or cut. ██ ██ ██ There is no testimony in the record whether the degree of that impairment affected blood clotting in ordinary circumstances, e.g., cuts or hemorrhage caused by trauma.[8] However, there is testimony that the change in Duarte's bone marrow rendered her peculiarly susceptible to suppression of the production of blood platelets if treated by chemotherapy, subjecting her to life-threatening spontaneous hemorrhaging. This susceptibility prevented the renewal of chemotherapy by Swanson before the detection of the recurrence of her cancer,[9] and precludes the present treatment of the cancer by this means.

This evidence shows that the change in Duarte's bone marrow was an appreciable *functional* impairment of the immune system. As a result of the overdose of cytoxin her bone marrow is no longer able to function in a

[6] In noting this basis for distinction between the two lines of cases cited in *Potter*, we imply no view on the exact question raised by the Supreme Court: the sufficiency of such a personal injury to support parasitic damages for fear of the occurrence of a correlated cancer.

[7] Since injury to Duarte's bone marrow is the only claim tendered, we address only that injury in the text. It is conceivable that the transitory illness suffered by Duarte as a result of the ingestion of the cytoxin overdose is also actionable. In the trial court Zachariah suggested that this illness was not compensable because Duarte did not prove a marginal severity of the induced illness attributable to the overdose. This presumes a showing of *increased* severity ought to be required even if the negligent overdose was useless for its intended purpose as chemotherapy. As the matter was not developed at trial and is unbriefed, we imply no view on it.

[8] We do not conclude from the absence of such testimony that the bone marrow damage has no such consequence. The Duartes' case was predicated on the view that they could recover damages for the recurrence of the cancer, and they did not overtly attend to the actionability of the harm to the bone marrow until confronted with the nonsuit motion. A fundamental rule of nonsuit doctrine is that the motion must identify the defects in the plaintiff's case with particularity to afford an opportunity to cure the defect by introducing additional evidence. (See 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 417, p. 418.) However, when the Duartes suggested that recovery might be predicated on the harm to the bone marrow, the trial court peremptorily and incorrectly rejected that prospect, foreclosing a request to reopen the plaintiffs' case. We do not suggest that the trial court erred in granting nonsuit because that may have foreclosed such a potential request. As indicated in the text, the trial court erred because, viewed in the light most favorable to plaintiffs (*Nally* v. *Grace Community Church, supra,* 47 Cal.3d at p. 291), the evidence that was adduced is sufficient by itself to sustain a verdict predicated on harm to Duarte's bone marrow.

[9] We do not imply that because the alteration rendered Duarte unable to undertake a course of chemotherapy she may recover damages measured by the recurrence of the cancer. As related earlier, the cancer cannot be causally attributed to the failure to renew chemotherapy.

manner that allows her to engage in a beneficial medical treatment, chemotherapy. This adverse change can only be fairly characterized as a detriment, "a loss or harm suffered in person" (Civ. Code, § 3282) and is a sufficient predicate for a cause of action for personal injury.

■ Zachariah argues that this theory of injury is not a basis to avoid the nonsuit because the Duartes proffered no evidence of emotional distress arising from that injury as distinguished from that which would arise from the recurrence of the cancer. The argument is untenable.

First, it puts the mental suffering cart before the physical injury horse. It is true, as *Potter* notes (6 Cal.4th at p. 981), that damages ordinarily may be recovered for emotional distress naturally ensuing from an actionable physical injury. (See also, e.g., *State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 338 [240 P.2d 282] and cases cited therein.) That does not mean that to be actionable a physical injury must give rise to emotional distress. Nor does it mean that emotional distress must always be established by direct evidence of the plaintiff's mental state. General damages may be awarded for the form of emotional distress called pain or suffering where it is a natural concomitant of a physical injury, inferable from the fact of the injury and the common experience of humanity. (See, e.g., *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 894-896 [103 Cal.Rptr. 856, 500 P.2d 880].) It is reasonable to infer that a person who has experienced a recurrence of cancer which cannot be treated because of bone marrow injury would suffer emotional distress as a result of the injury.

■ Second, Zachariah claims that the theory that emotional distress is attributable to the bone marrow damage was not called to the attention of the trial court. However, as related (fn. 8, *ante*), the defects in the plaintiff's case must be identified by the defendant in the nonsuit proceedings in the trial court in order to afford an opportunity for cure. On appellate review a nonsuit may be upheld on grounds not specified in the trial court only if it is clear that the newly urged defect is one which would not have been remedied. (See, e.g., *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 93 [147 P.2d 604].) Moreover, as related, compensation could be awarded for the functional impairment caused by the bone marrow injury even if Duarte suffered no consequent emotional distress.

■ Zachariah next argues that recovery should be denied because there is no standard for damages unless Duarte can show that the injury to the bone marrow is a cause in fact of a subsequent bodily injury, e.g., a cancer, resulting in gross and clearly ascertainable pecuniary loss. We disagree. Compensatory damages may be awarded for bodily harm without proof of pecuniary loss. (See Rest.2d Torts, § 905.) The fact that there is no market price calculus available to measure the amount of appropriate compensation does not render such a tortious injury noncompensable. "For harm to body, feelings or reputation, compensatory damages reasonably proportioned to the

intensity and duration of the harm can be awarded without proof of amount other than evidence of the nature of the harm. There is no direct correspondence between money and harm to the body, feelings or reputation. There is no market price for a scar or for loss of hearing since the damages are not measured by the amount for which one would be willing to suffer the harm. The discretion of the judge or jury determines the amount of recovery, the only standard being such an amount as a reasonable person would estimate as fair compensation." (Rest.2d Torts, § 912, com. b., pp. 479-480.)

There are many harmful alterations of the body for which it would be difficult to articulate a precise measure of appropriate compensation. Garden-variety pain and suffering defies a nice standard for calculation. The partial but appreciable impairment of function, say of a sense organ, would obviously be compensable, however difficult it would be to quantify damages.

Here, the injury to the bone marrow has economic value even assuming that the only impairment is the inability to undertake a course of chemotherapy. Even if such a treatment diminishes the likelihood of recurrence of the cancer by only 5 percent, patients willingly pay the economic costs of the treatment and bear the significant pain and discomfort occasioned as its side effects. This alone shows that there is a significant value to the bodily capacity to undertake such treatment, which we are bound to assume was destroyed by Zachariah's negligence. To conclude otherwise is to say that no injury short of cancer is compensable. That would make for an unprecedented rule which denies recovery for all manner of detrimental impairments to the organs of the body.

The trial court erred in granting a nonsuit, since the Duartes' evidence tenders a triable cause of action within the allegations of their complaint.

## DISPOSITION

The judgment is reversed. The Duartes shall recover their costs of this appeal.

Sparks, J., and Scotland, J., concurred.

A petition for a rehearing was denied March 30, 1994, and the opinion was modified to read as printed above. The supplemental opinion on denial of rehearing was not certified for publication. Respondents' petition for review by the Supreme Court was denied June 30, 1994.